UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PARRIS M. MEDLEY,

     Plaintiff,                               Case No. 13-cv-12499
                                              Hon. Matthew F. Leitman

v.

COMCAST CABLE COMMUNICATIONS
MANAGEMENT, LLC,

     Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #30)

## INTRODUCTION

In this action, Plaintiff Parris M. Medley ("Medley") alleges that Defendant Comcast Cable Communications Management, LLC ("Comcast") fired her in retaliation for taking protected leave pursuant to the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. (the "FMLA"). Comcast denies that it violated the FMLA, and it has now moved for summary judgment. For the reasons stated below, the Court **DENIES** Comcast's motion.

## FACTUAL BACKGROUND

### A.    Comcast Hires Medley and Trains Her To Follow its Risk Management and Amnesty Policies

On August 15, 2011, Comcast hired Medley as a Customer Account Executive (a "CAE"). (*See* Medley Deposition, ECF #28-2 at 63, Pg. ID 154.)

1

CAEs work at a call center and sell Comcast services to current and potential customers. (*See id.* at 72, Pg. ID 156.) Medley's direct supervisor was Renee McFadden ("McFadden"), who oversaw a team of CAEs, including Medley. (*See id.* at 64, Pg. ID 154.)

Comcast trained Medley for six weeks before she began work. (*See id.* at 63, Pg. ID 154) During this training, Comcast taught Medley about its Risk Management Policy – a policy aimed at, among other things, reducing Comcast's uncollectible debts. (*See id.* at 68-69, Pg. ID 155-156, 73-74, Pg. ID 156.) The Risk Management Policy prohibits CAEs from starting new services for customers with unpaid balances unless they settle their prior debts; it also requires certain high-risk customers to pay a security deposit before a CAE can establish service. (*See* Declaration of Comcast Manager for Inbound Sales Manager Madeir Boothe (the "Booth Decl."), ECF #28-3 at ¶4.) Medley understood that this policy was important to Comcast and that she was "always" supposed follow the written "bad debt" guidelines in the Risk Management Policy. (Medley Dep. at 86-89, Pg. ID 160-161.)

However, Medley says that Comcast also trained her to provide "amnesty" to certain customers with unpaid debts. (*See* Medley Dep. at 74-75, Pg. ID 157.) Medley testified that Comcast instructed her that any debts over three years-old would be "automatically … wiped clean" and that she *was* permitted to set-up new

services for customers whose debts were more than three years-old.  (*Id.; see also id.* at 90, Pg. ID 161.)  Thus, according to Medley, Comcast's "amnesty" policy operated as an exception to the prohibition in the Risk Management Policy against starting services for customers with unpaid balances.  Comcast employee Willie Lewis ("Lewis") – a supervisor like McFadden – confirmed that "if the bad debt was over three years old, in most cases we wiped it out and got the client a fresh start," and that a CAE like Medley could offer amnesty to eligible customers "without violating the Risk Management Policy." (Lewis Dep., ECF #32-3 at 139-140, Pg. ID 528.)

Comcast also provided Medley with training concerning other issues related to customers who presented potential credit risks.  This training included, among other things, guidelines concerning when Medley should run a credit check on customers seeking to add services and when such a check would be unnecessary. (*See* Medley Dep. at 76-77, Pg. ID 157-158; *see also id.* at 82-83, Pg. ID 159.)

**B.    Medley's FMLA Leave and McFadden's Stated Intention to Retaliate Against Medley for Taking Such Leave**

On August 27, 2012, Medley began an FMLA leave during which she had surgery to remove boils.  (*See id.* at 140-141, Pg. ID 173-174.)  While Medley was on FMLA leave, nobody from Comcast interfered with her leave nor disputed her entitlement to time off.  (*See id.* at 154, Pg. ID 177; *see also id.* at 160, Pg. ID 178.)  McFadden even texted Medley during her leave to suggest that Medley

3

"take it easy!"  (Declaration of Renee McFadden (the "McFadden Decl.," ECF #28-5 at ¶6.)

McFadden's support of Medley contrasted with her alleged statements concerning FMLA leave generally and regarding Medley's specific use of such leave.  McFadden worried that employees' use of FMLA leave was preventing the call center from reaching its sales targets and was threatening the continued viability of the center.  Indeed, before Medley requested FMLA leave, McFadden told Medley that "if people keep taking FMLA [leave]," they "won't have jobs," and "the call center would close…." (Medley Dep. at 146-148, Pg. ID 175.) Medley insists that these comments by McFadden applied to employees who legitimately needed to take FMLA-protected leave *and* employees who were "abusing FMLA [leave] for personal reasons…." (*Id.* at 147, Pg. ID 175.)  In addition, Lewis reports that "McFadden had a reputation around the call center of not liking employees who took FMLA leave" and that McFadden "frequently [said that] she did not like FMLA leave and the employees who took it."  (Declaration of Willie Lewis (the "Lewis Decl."), ECF #32-2 at ¶¶8-9.)[1]

Lewis also testified that McFadden was not happy about Medley's use of

---

[1] Lewis did testify that he personally believed that McFadden disliked *only* employees who abused FMLA leave, *not* employees who "actually needed it." (Lewis Dep. at 130, Pg. ID 526.)  However, Lewis acknowledged that McFadden's anti-FMLA comments – quoted above in text – "did not distinguish" between employees McFadden "thought legitimately were taking FMLA leave [and] those that [McFadden] thought were abusing [it]."  (*Id.*)

4

FMLA leave.  Lewis says that McFadden told him that "if [Medley] thought she was going to use FMLA 'she has another thing coming because *I will get rid of her*.'"  (Lewis Decl. at ¶11; emphasis added; *see also* Lewis Dep. at 87-90, Pg. ID 517-518.)  Lewis also contends that McFadden told him that "she believed Medley went on FMLA to avoid being terminated" (Lewis Decl. at ¶14) and that McFadden said "something to the effect of: 'She [Medley] won't be with us very long when she comes back [from FMLA leave].'" (*Id.* at ¶15; *see also* Lewis Dep. at 90, Pg. ID 517.)[2]

## C.   Comcast Investigates Medley for Violations of the Risk Management Policy

On September 14, 2012, while Medley was still on leave, Comcast's security team informed Comcast Inbound Sales Manager Madeir Boothe ("Boothe") that Medley had violated Comcast's Risk Management Policy in June 2012 when she started services for a former customer who still owed Comcast over $2,000.  (*See* Boothe Decl. at ¶8.)   Boothe then asked McFadden to audit ten of Medley's

---

[2]  Lewis' testimony regarding the timing of McFadden's alleged statements concerning Medley's leave is inconsistent.  Medley says that under the best reading of Lewis' testimony – or at least the one that is most favorable to her, which the Court must accept for purposes of summary judgment – McFadden made the "I will get rid of her" comment before McFadden had any knowledge that Medley may have violated the Risk Management Policy.  (*See* Medley Resp. Br., ECF #32 at 15, Pg. ID 487.)  Comcast counters that McFadden's conversations with Lewis happened *after* Medley returned from leave and after McFadden had learned about Medley's alleged violations of the Risk Management Policy.  (*See* Comcast Reply Br., ECF #33 at 5-8, Pg. ID 625-628.)  In any event, there is no dispute that Lewis has McFadden making the statements before Comcast fired Medley.

customer files in order to determine whether Medley had committed other violations of the Risk Management Policy. (*See id.*) McFadden randomly selected ten files to audit, and she completed her review of the files by September 18th or 19th. (*See* McFadden Decl. at ¶7.) McFadden determined that Medley had violated Comcast's Risk Management Policy with respect to six of the ten audited files. (*See id.*) McFadden shared her findings with both Boothe and with Comcast HR Manager Brenda Butcher ("Butcher"). (*See id.* at ¶¶7-8.)

## D.   Comcast Accuses Medley of Violating the Risk Management Policy; Medley Responds That She Acted Consistent With Her Training

Medley returned from her FMLA leave on September 19, 2012. (*See* Medley Dep. at 167, Pg. ID 180.) The next day, she met with McFadden and Butcher to discuss McFadden's audit. (*See id.* at 168, Pg. ID 180.) McFadden and Butcher told Medley that they believed she (Medley) had violated Comcast's Risk Management Policy with respect to six of the ten audited files. (*See* McFadden Decl. at ¶8.) Medley reviewed some of the files on McFadden's laptop; she also had hard copies of "papers" that she "went by" as she offered her explanations of her actions with respect to each file. (Medley Dep. at 179, Pg. ID 183.)

Medley did not dispute that the Risk Management Policy, *standing alone,* would have prevented her from starting service on the files. (*See id.* at 170-180, Pg. ID 181-183.) However, Medley says that she gave McFadden and Butcher a "detailed explanation of *each*" of the files, and she explained that starting service

6

for those customers was consistent with "how [she] was trained" on, among other things, Comcast's amnesty policy. (*Id.* at 170-172, Pg. ID 181 (emphasis added); *see also id.* at 179, Pg. ID 183.)  Importantly, Medley also says that during the meeting, McFadden *agreed* that Medley had acted consistent with her training. (*See id.* at 170-171, Pg. ID 181.)

At the conclusion of the meeting, Medley signed a summary of the violations McFadden had drafted.  (*See* ECF #28-10.)  In a box labeled "employee comments," Medley wrote that she was "not clear on bad debt process, have asked questions before about bad debt." (*Id.*)  At this same time, Comcast placed Medley on paid administrative leave pending the outcome its investigation.  (*See* ECF #28-12.)

### E.   Comcast Terminates Medley's Employment and Provides Multiple Explanations as to Who Was Involved in the Termination Decision

By letter dated September 24, 2012, McFadden informed Medley that Comcast had "concluded its investigation" and that "as a result, [her] employment with Comcast is being terminated…." (ECF # 28-14.)  McFadden told Medley that the "termination is based on violation of the Comcast Conduct Policy." (*Id.*)

Comcast has provided multiple explanations as to who was involved in the decision to fire Medley – at least two of which involve McFadden.  Comcast's varying explanations include the following:

7

- Before this civil action began, Comcast told the United States Equal Employment Opportunity Commission that the decision to fire Medley was "*approved by Ms. McFadden*; Ms. Butcher; Monica Franklin, Sr. Director of Human Resources; Julie Harrison, VP of Human Resources; and Doug Pelletiere, VP of Labor & Employee Relations, Central Division." (ECF #32-6 at 3, Pg. ID 540; emphasis added.);

- In her initial interrogatories to Comcast, Medley asked for the "name … of each person who participated in the decision to terminate [her] employment," and Comcast responded by identifying only "Brenda Butcher, Monica Franklin, and Julie Harrison." (ECF #32-8 at Interrog. #12.);

- In a subsequent interrogatory answer, Comcast stated that *McFadden* "partnered with" Boothe, a Comcast manager, and with Human Resources "in determining that an audit was warranted, reviewing the audit results, and *deciding that termination was warranted* based on the results of the audit and Plaintiff's failure to adequately explain her actions." (ECF #33-3 at Interrog. #1; emphasis added.)  In this discovery response, Comcast also identified Derrick Williams as an employee who had "reviewed the situation with Ms. Boothe and agreed that the termination was warranted." (*Id.* at Interrog. #2.); and

- In her sworn declaration, Boothe explained that she "met with Mr. Williams to review the situation, and [they] agreed to recommend that [Medley's] employment be terminated.  Mr. Williams then reviewed the matter with the Human Resources Manager to formalize a termination recommendation.  Three levels of Human Resources then reviewed the situation … and reported back to [Boothe] that the termination recommendation was accepted." (Boothe Decl. at ¶10.)

## PROCEDURAL HISTORY

Medley filed her one-count First Amended Complaint against Comcast on August 2, 2013.  (*See* First. Am. Compl., ECF #4.)  In her Amended Complaint, Medley alleges that Comcast "retaliated against [her] for exercising her rights under the FMLA by terminating her employment." (*Id.* at ¶13.)  Comcast moved

8

for summary judgment on April 8, 2014.  (ECF #30 at Pg. ID 290.)  The Court
heard oral argument on Comcast's motion on September 15, 2014.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no
genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services,
Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 251–52 (1986)) (quotations omitted). "The mere existence of a
scintilla of evidence in support of the [non-moving party's] position will be
insufficient; there must be evidence on which the jury could reasonably find for
[that party]." *Anderson,* 477 U.S. at 252.  However, summary judgment is not
appropriate when "the evidence presents a sufficient disagreement to require
submission to a jury." *Id.* at 251-252.  When reviewing the record, "the court must
view the evidence in the light most favorable to the non-moving party and draw all
reasonable inferences in its favor."  *Id.*  Indeed, "[c]redibility determinations, the
weighing of the evidence, and the drafting of legitimate inferences from the facts
are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

### A.    Applicable Legal Framework for Analyzing Medley's FMLA Retaliation Claim

The FMLA allows an eligible employee "a total of 12 workweeks of leave
during any 12–month period…[b]ecause of a serious health condition that makes

9

the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  "An employer is [] prohibited from 'discharg[ing] or in any other manner discriminat[ing]'" or retaliating against an employee for taking FMLA leave.  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (quoting 29 U.S.C. §2615(a)(2)).  "A plaintiff can prove [her] FMLA retaliation claim using either direct or indirect evidence.  The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both."  *Id.* at 432 (internal citation and quotation marks omitted).

"Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Id.* (internal quotation marks omitted).  "The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of FMLA leave, but also that the employer acted on that predisposition."  *Id.* (internal brackets omitted). "If an employee successfully presents direct evidence that the employer acted with discriminatory motive, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."  *Id.* (internal quotation marks omitted).  In other words, "an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse

10

action."  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).

**B.    Medley's Direct Evidence Creates a Material Factual Dispute as to Whether Comcast Retaliated Against Her for Taking FMLA Leave**

Medley has presented sufficient evidence to support a finding that her supervisor, McFadden, was pre-disposed to discriminate against employees who used FMLA leave and, more importantly, that McFadden retaliated against Medley for taking such leave.  Medley and Lewis both said that McFadden expressed her displeasure with employees using FMLA leave. (*See* Medley Dep. at 146-148, Pg. ID 175; *see also* Lewis Decl. at ¶¶8-9.)  Moreover, Lewis said in his sworn declaration (and confirmed during his testimony) that McFadden told him both (1) that "if [Medley] thought she was going to use FMLA 'she has another thing coming because *I will get rid of her*'" (Lewis Decl. at ¶11; emphasis added; *see also* Lewis Dep. at 87-90, Pg. ID 517-518), and (2) "something to the effect of: 'She [Medley] won't be with us very long when she comes back [from FMLA leave]'" (Lewis Decl. at ¶15; Lewis Dep. at 90, Pg. ID 518).

The Sixth Circuit has held that statements just like these are sufficient direct evidence of FMLA retaliation.  In *Daugherty*, for example, an employee informed his employer that he intended to take a four-to-six week FMLA protected leave, and his supervisor told him "if [he] took that FMLA leave for that period of time …. there would not be a job waiting for [him] when [he] returned."  *Id.* at 708 (internal punctuation omitted).  The Sixth Circuit said that "this unambiguous

11

comment, which we must take as true at the summary judgment stage, constitutes direct evidence that [the employee's] termination was motivated by unlawful, discriminatory animus." *Id. see also Demyanovich*, 747 F.3d at 432 (holding that employee "successfully provided direct evidence of retaliation" where supervisor "referred to [employee] as a 'liability' immediately after [the employee] requested FMLA leave" and then terminated the employee's employment).

Comcast responds that even if McFadden's statements are direct evidence that McFadden harbored anti-FMLA animus, the statements are not direct evidence that *Comcast* unlawfully retaliated against Medley. Citing *Geiger v. Tower Automotive*, 579 F.3d 614, 620-621 (6th Cir. 2009), Comcast insists that McFadden's alleged state of mind is not relevant because she was not a "decision-maker" with respect to Medley's termination.[3] (Comcast Reply Br. at 32-34, Pg. ID 652-654.) In *Geiger*, the Sixth Circuit held that "[a]ny discriminatory statements must come from decisionmakers to constitute evidence of discrimination. Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden of demonstrating animus." *Geiger*, 579 F.3d at 620-621.

However, Comcast's "McFadden-is-not-a-decision-maker" argument cannot

---

[3] *Geiger* did not involve a claim under the FMLA. Instead, the plaintiff in that case alleged that his employer terminated his employment in violation of the federal Age Discrimination in Employment Act. *See id.* Nonetheless, the Court will assume without deciding that the cited analysis applies here.

carry the day because there is a material factual dispute as to whether McFadden was in fact a decision maker.  While McFadden has declared that she "was not involved in [the] decision" to fire Medley (*see* McFaddden Decl. at ¶8), a reasonable jury could find differently.  Indeed, the record contains evidence of statements by Comcast that could support a finding that McFadden was a decision maker.  For example, Comcast said that McFadden "partnered with" Boothe in "*deciding* that termination [of Medley] was warranted" (ECF #33-3 at Interrogatory #1; emphasis added) and that McFadden "approved" Medley's termination. (ECF #32-6 at 3, Pg. ID 540).  Moreover, McFadden's statement to Lewis that she could "get rid of" Medley is evidence that McFadden regarded herself as having the ability to cause Medley's termination.  This evidence, viewed in the light most favorable to Medley, is sufficient to support a finding that McFadden was involved in the substantive decision to terminate Medley's employment.

Because Medley has presented direct evidence of discrimination by McFadden, Comcast can prevail on its summary judgment motion only if it establishes that it would have fired Medley even absent McFadden's improper motive. *Demyanovich*, 747 F.3d at 427.  Comcast says it has satisfied that burden by presenting undisputed evidence that (1) Medley violated the Risk Management Policy more than five times and (2) Comcast has consistently terminated all

13

employees who violate the policy more than five times.  (*See* Comcast Br., ECF #30 at 12-13, Pg. ID 308-309; *see also* Comcast Reply Br. at 35-36, Pg. ID 655-656.)

However, there is a material factual dispute as to whether Medley committed actionable misconduct.  As described above, Medley has presented evidence that (1) she was trained, among other things, that she could provide "amnesty" to, and start services for, customers with certain qualifying debts; (2) starting services for such customers was permissible even though otherwise prohibited by the Risk Management Policy; (3) when confronted with the results of McFadden's audit, she offered an explanation as to how her handling of "each" account was consistent with her training; and (4) McFadden *agreed* that Medley's handling of "each" account was *consistent* with Medley's training.  In light of this evidence – particularly McFadden's agreement – the Court cannot accept Comcast's argument that Medley's misconduct is "undisputed."

Comcast insists that there simply cannot be a factual dispute as to whether Medley violated the Risk Management Policy—and thus as to whether it would have terminated Medley's employment regardless of McFadden's improper motive – because Medley repeatedly testified that she "did not dispute" the findings from McFadden's audit that she violated the policy and because she "agreed that each call on the audit violated the Risk Management Policy."  (Comcast Br. at 8, Pg. ID

14

123, citing Medley Dep. at 168-182.) Comcast's interpretation of Medley's testimony is a reasonable one – and it may even be the best one.  But it is not the only permissible one – especially when the testimony is viewed in Medley's favor. Medley's testimony, read in its entirety and construed in her favor, can reasonably be interpreted as Medley admitting that her conduct violated the Risk Management Policy but contending that the conduct was nonetheless acceptable because it was consistent with the training Comcast provided her, including the training related to, among other things, the "amnesty" policy and when credit checks needed to be run. Medley's statements at page 170 of her deposition support this view of her testimony.  There, she testified that she does not dispute that these "things" (the violations McFadden identified) occurred, but she reiterated that she provided Comcast an explanation for "each account" – namely, that she acted consistent with her training.  Likewise, at page 182, lines 14-21 of her deposition, Medley testified that she does not dispute that "these things [cited by McFadden] occurred," but she reiterated that the "things" might have qualified for "amnesty" or otherwise have been consistent with her training.  Simply put, there is at least one reasonable reading of Medley's testimony under which she disputed that she committed misconduct that would warrant the termination of her employment.

The Court acknowledges that during her deposition Medley was unable to explain to how any of the Risk Management Policy violations found by McFadden

15

were, in fact, allowable pursuant to the "amnesty" policy or were otherwise consistent with her training. However, as noted above, Medley testified that when McFadden and Butcher confronted her with the violations, McFadden agreed that Medley's conduct on "each" account was consistent with Medley's training. McFadden's purported agreement is evidence – albeit disputed – that Medley's conduct was consistent with her Comcast-provided training and, accordingly, not necessarily a ground for termination of her employment.[4]

Moreover, it is not clear that the employees identified by Comcast as comparables – those fired for violating the Risk Management Policy more than five times – are similarly situated to Medley. More specifically, there is no evidence that any Comcast supervisor agreed that these employees acted consistent with their Comcast-provided training when they started services in a way that allegedly contravened the Risk Management Policy – as McFadden did with

---

[4] At oral argument, Comcast argued that even if the Court applied Medley's understanding of the amnesty policy to the files identified by McFadden, Medley would still lose. Comcast insisted that at least five of the files either (1) did not qualify for amnesty (as understood by Medley) or (2) violated the Risk Management Policy in some way besides amnesty ineligibility. Thus, according to Comcast, even after application of the amnesty policy, there would still be five violations of the Risk Management Policy – and Medley would still fall into the group of five-time violators who Comcast uniformly terminated. However, the evidence in the record concerning the precise status of each file is not sufficiently conclusive to eliminate a factual dispute as to whether Medley's starting of services on the files was impermissible – especially in light of McFadden's agreement that, when Medley started the services, Medley acted consistent with her training on, among other things, the amnesty policy and when credit checks needed to be run.

16

respect to Medley.  Thus, at this stage in the proceedings, the fact that Comcast fired the other five-time violators does not necessarily establish that Comcast would have fired Medley absent McFadden's anti-FMLA bias.

Under all of these circumstances, "it is appropriate for the trier of fact to resolve whether [Comcast], in the face of direct evidence of discriminatory animus, has successfully met its requisite burden of showing that, absent any discriminatory motivation, it would have made the same decision" to fire Medley. *Daugherty*, 544 F.3d at 710.

## CONCLUSION

For all of the reasons stated in this Opinion and Order, Comcast's Motion for Summary Judgment (ECF #30) is hereby **DENIED**.



s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2014


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 29, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113